Estelle McKINLEY, Petitioner,

v.

BRONCO BILLY'S, Colorado Compensation Insurance Authority, and The Industrial Claim Appeals Office of the State of Colorado, Respondents.

No. 95CA0150.

Colorado Court of Appeals,
Division III.

Aug. 24, 1995.

Alexander & Ricci, William A. Alexander, Jr., Colorado Springs, for petitioner.

Curt Kriksciun, Denver, for respondents Bronco Billy's and Colorado Compensation Ins. Authority.

No appearance for respondent Indust. Claim Appeals Office.

Opinion by Judge BRIGGS.

Estelle McKinley (claimant) seeks review of a final order of the Industrial Claim Appeals Office (Panel) awarding her temporary total disability benefits until she was released to regular employment and awarding permanent partial disability benefits based upon a scheduled impairment under § 8–42–107, C.R.S. (1994 Cum.Supp.). We affirm.

Claimant sustained an eye injury while working as a cashier for Bronco Billy's (employer). The treating physician released her to return to regular employment the following week. However, claimant worked a split shift and complained of difficulties with vision when driving to work at night. She therefore did not return to work.

Claimant reached maximum medical improvement two months after her injury. Because the treating physician was not accredited to rate claimant's permanent impairment, he referred her to another physician. That physician, using the *American Medical Association Guides to the Evaluation of Permanent Impairment (AMA Guides)*, concluded that she suffered a 35% physical impairment of the left eye based upon loss of visual acuity and an 18% physical impairment of the same eye based upon blindness. He combined the two impairments for a total left eye impairment of 47% and converted the result to an 11% whole person impairment rating.

As to temporary disability, the Administrative Law Judge (ALJ) found that, although the treating physician had released claimant to return to work, he had restricted her night driving. Because the employer had not been able to modify claimant's work schedule to avoid her working at night, the ALJ determined that claimant's temporary total disability ended, not when she was released to

work, but when she reached maximum medical improvement two months later.

As to permanent impairment, the ALJ concluded that "visual acuity" was the ability to see objects in a clear manner and that a loss of visual acuity differed from "blindness." Because blindness was included in § 8–42–107(2), C.R.S. (1994 Cum.Supp.) as a scheduled injury but loss of visual acuity was not, the ALJ concluded that claimant was entitled to a whole person impairment rating under § 8–42–107(8)(a), C.R.S. (1994 Cum.Supp.) (when injury results in medical impairment not set forth in the schedule, employee entitled to medical impairment benefits). Thus, the ALJ awarded claimant permanent partial disability benefits based upon the physician's rating of an 11% medical impairment.

The Panel set aside the award of both temporary total and permanent partial disability benefits. As to temporary benefits, the Panel concluded that, despite any restriction on night driving, claimant had been given a written release to return to regular employment within the meaning of § 8–42–105(3)(c), C.R.S. (1994 Cum.Supp.). Hence, the physician's release to return to regular employment on March 3, 1993, terminated claimant's entitlement to temporary benefits as of that date.

As to permanent benefits, the Panel concluded that "loss of visual acuity" was encompassed in "blindness." Claimant was therefore limited to an award of benefits pursuant to the schedule of injuries set forth in § 8–42–107(2).

## I.

■ Claimant first contends that the Panel terminated her temporary total disability benefits prematurely by relying on the physician's release to regular employment as the termination date. She argues that her problem with night driving prevented her from traveling to her regular employment and, because this problem resulted from her industrial injury, temporary benefits should not end until she reached maximum medical improvement. We disagree.

Temporary disability benefits continue until any one of three specified conditions occurs. *See* § 8–42–105(3), C.R.S. (1994 Cum. Supp.); *Burns v. Robinson Dairy, Inc.,* — P.2d — (Colo.App. No. 95CA0131, June 15, 1995). One such condition is that "[t]he attending physician gives the employee a written release to return to regular employment." Section 8–42–105(3)(c).

While forms of transportation other than driving may not have been available in the small mountain town in which claimant resides, she does not dispute that on the date of her treating physician's release she was able to perform her regular employment. The duties of that employment did not include night driving. *Cf. Berry's Coffee Shop, Inc. v. Palomba,* 161 Colo. 369, 423 P.2d 2 (1967) (an employee's travel to and from work falls outside the scope of employment for purposes of workers' compensation).

■ Section 8–42–105(3)(c) is part of a statutory scheme designed to limit the scope and frequency of disputes concerning the duration of temporary total disability benefits. *See Burns v. Robinson Dairy, Inc., supra.* It unambiguously provides for the termination of benefits upon a claimant's release to return to regular employment. We therefore conclude that the ALJ was bound to terminate temporary total disability benefits as of the date claimant was released to return to regular employment.

## II.

■ Claimant next contends the Panel erred in its conclusion that her injury must be compensated as a scheduled injury under § 8–42–107(2). We again disagree.

In 1991 the General Assembly changed the method of determining permanent disability benefits. The benefits to be awarded for the loss, or total or partial loss of use, of any member described in the schedule in § 8–42–107(2) were limited to the benefits set forth in that schedule. If the loss of use was partial, then under § 8–42–107(7)(b), C.R.S. (1994 Cum.Supp.), the amount of compensation was to be the proportionate share of the amount stated in the schedule for the total loss of a member. For permanent impairments not described in that schedule, benefits were to be determined pursuant to the

system established in § 8–42–107(8), C.R.S. (1994 Cum.Supp.), which referenced the *AMA Guides* and the claimant's age and wage. *See* Colo.Sess.Laws 1991, ch. 219, § 8–42–107(7) & (8) at 1306–11; *Colorado AFL–CIO v. Donlon,* —— P.2d —— (Colo. App. Nos. 93CA1118 & 93CA1392, June 15, 1995).

The General Assembly in 1992 enacted an additional subsection, § 8–42–107(8)(c.5), C.R.S. (1994 Cum.Supp.), to provide that if an injury results in the total loss or total loss of use of one of the upper or lower extremities, or of an eye, the impairment will be compensated under § 8–42–107(8). Section 8–42–107(7)(b) was amended to except from its coverage those injuries now compensated under § 8–42–107(8). *See* Colo.Sess.Laws 1992, ch. 239, § 8–42–107(8)(c.5) at 1833–1834; *Colorado AFL–CIO v. Donlon, supra.*

Claimant contends the Panel erred by failing to treat separately "loss of visual acuity" and "blindness." She requests that we take judicial notice of the "undisputed scientific fact" that they are not the same in that blindness is the inability of the cones and rods in the retina to perceive light, while loss of visual acuity is the inability to focus properly the light perceived. She argues that benefits for loss of visual acuity therefore cannot be calculated under the listing for "blindness" in § 8–42–107(2).

Claimant's argument ignores two other statutory provisions relevant to her claim. Section 8–42–107(7)(b) provides that benefits for the partial "loss of use" of any member specified in the schedule in § 8–42–107(2) is limited to a proportionate share of the amount stated in that schedule. And, pursuant to § 8–42–107(8)(c.5), only benefits for the "total loss or loss of use of . . . an eye" are to be determined under § 8–42–107(8). These statutory provisions make no distinction based on the medical reason for the loss of use.

We must construe the workers' compensation statutory scheme in a manner that gives consistent, harmonious, and sensible effect to all of its parts. *See PDM Molding, Inc. v. Stanberg,* 898 P.2d 542 (Colo.1995); *Henderson v. RSI, Inc.,* 824 P.2d 91 (Colo.App.1991). In doing so, we must presume the General Assembly intended a just and reasonable result and thus provide a construction that avoids absurd results. *See* § 2–4–201, C.R.S. (1980 Repl. Vol. 1B); *Smith v. Zufelt,* 880 P.2d 1178 (Colo.1994).

If we were to adopt claimant's construction of § 8–42–107(2), (7)(b), and (8), the effect would be that benefits for partial loss of use of an eye resulting from loss of visual acuity would not be calculated under the schedule in § 8–42–107(2). This is because the injury would not result from the "loss of an eye by enucleation (including disfigurement resulting therefrom)," as provided in § 8–42–107(2)(ff), C.R.S. (1994 Cum.Supp.), or from "blindness," as provided in § 8–42–107(2)(gg), C.R.S. (1994 Cum.Supp.). Yet benefits could not be calculated under § 8–42–107(8) because the injury does not constitute a "total loss or loss of use . . . of an eye," as required under § 8–42–107(8)(c.5).

Furthermore, even if the statutory language were ambiguous as to whether benefits should be calculated under § 8–42–107(8) for a partial loss of use of an eye resulting from loss of visual acuity, benefits calculated under § 8–42–107(8) are generally greater than benefits provided under the schedule in § 8–42–107(2). *See Duran v. Industrial Claim Appeals Office,* 883 P.2d 477 (Colo. 1994); *Colorado AFL–CIO v. Donlon, supra.* Thus, under claimant's interpretation, in many instances a claimant could recover greater benefits, pursuant to § 8–42–107(8)(c.5), with a minor loss of use of an eye resulting from "loss of visual acuity" than could a claimant with a substantial loss of use from "blindness," pursuant to § 8–42–107(7)(b). We cannot presume the General Assembly intended such unjust results.

In contrast, by construing "blindness" to include any loss of use of the eye, regardless of the medical reason, then § 8–42–107(2) provides the less generous benefits for any partial loss of use of an eye, while § 8–42–107(8) provides the more generous benefits for any total loss of use. This interpretation gives harmonious, consistent, and sensible effect to all parts of the statutory scheme

with a result that is more reasonable and just.

For these reasons, we conclude that the Panel did not err in awarding claimant permanent partial disability benefits under § 8–42–107(2).

Order affirmed.

STERNBERG, C.J., and PIERCE,* J., concur.