Cathy M. CAMPBELL, Petitioner,

v.

IBM CORPORATION, Liberty Mutual Insurance Company, The Industrial Claim Appeals Office of the State of Colorado, and Director, the Colorado Department of Labor, Division of Workers' Compensation, Respondents.

No. 92CA0994.

Colorado Court of Appeals,
Div. IV.

June 17, 1993.

Rehearing Denied Aug. 5, 1993.

Certiorari Denied Jan. 24, 1994.

Kristine E. Anderson, Longmont, for petitioner.

The Connell Law Firm, Curt Kriksciun, Denver, for respondents IBM Corp. and Liberty Mut. Ins. Co.

No appearance for respondents Industrial Claim Appeals Office and Director, Colorado Dept. of Labor.

Opinion by Judge PLANK.

In this workers' compensation case, Cathy M. Campbell (claimant) contests a final order of the Industrial Claim Appeals Panel denying imposition of a notice penalty against the employer, IBM Corporation, and its insurance carrier, Liberty Mutual Insurance Co. (Liberty Mutual). Claimant also contests the determination of her average weekly wage and the conclusion that she suffered an accidental injury rather than an occupational disease. We affirm in part, set aside in part, and remand.

Claimant worked as a chemical processor for IBM when she was first injured in February 1979. However, she continued to work

and her condition progressively deteriorated for more than ten years until she ceased work in November 1989. The nature of claimant's injury and the lengthy interval between her initial injury and her eventual disability present complex issues for resolution.

Although IBM had workers' compensation insurance through Liberty Mutual, IBM also provided a wage continuation plan for its employees who were injured on the job. Under the plan, IBM paid its injured employees their full salary for all periods of work-related temporary disability. IBM then sought reimbursement from its carrier for the amount that would have been payable to the employee under the Workers' Compensation Act. IBM employees thus received full salary for all periods of work-related disability, and IBM, depending on the type of benefits payable, generally received reimbursement amounting to sixty-six and two-thirds percent of the employee's average weekly wage. Wage continuation plans, such as the IBM plan, are specifically authorized under the provision of the Workers' Compensation Act now codified as § 8–42–124, C.R.S. (1992 Cum.Supp.).

Similarly, IBM paid for its employees' work-related medical expenses and then sought reimbursement for the expenses from Liberty Mutual.

The claimant sought a penalty against both IBM and Liberty Mutual, commencing October 12, 1979, for failure timely to admit or deny liability. The penalty claim against IBM was dismissed as a matter of law in an administrative ruling that was affirmed by the Panel in August 1990.

Thereafter, following a hearing, the ALJ imposed a penalty against Liberty Mutual; however, the ALJ calculated the inception date of the penalty from April 17, 1989. He also concluded that claimant's injury was accidental and that disability benefits should be calculated based on claimant's weekly earnings in 1979, rather than her increased earnings during subsequent periods of disability. The issue of permanent disability was reserved for later determination. On review, the Panel affirmed the ALJ's order.

## I.

■ Claimant first challenges the validity of the Panel's August 1990 order refusing to impose a penalty against IBM. We agree that such order is void since it was signed by only two of the three Panel members required to act at that time. *O'Gorman v. Industrial Claim Appeals Office*, 839 P.2d 1149 (Colo.1992). The August 1990 order must therefore be set aside and the cause remanded for further proceedings on the issues addressed by that order.

## II.

■ We next consider whether a notice penalty should be imposed against Liberty Mutual Fire Insurance Company prior to April 17, 1989. We conclude that the ALJ's ruling is binding on review.

### A. Supplemental Notice of Injury

Under the applicable statute, Colo.Sess. Laws 1975, ch. 71, § 8–53–102, at 306, the duty to admit or deny liability arises only if an employee is disabled for more than "three calendar days," or if the employer or its insurer has notice or knowledge that the employee has filed a claim for benefits. The statute provides:

> Where the employer's report of injury shows that the employee is temporarily disabled for three days or less and medical attention as provided by section 8–49–101, if required, has been afforded at the expense of the employer or the insurance carrier, then no admission or denial of liability need be filed until the employer or, if insured, his insurance carrier has knowledge of or notice of claim for compensation benefits....

(subsequently amended and recodified as § 8–43–203(1), C.R.S. (1992 Cum.Supp.)).

■ We agree with the claimant that the duty to admit or deny liability is triggered by *either* a First Report of Injury or a Supplemental Report of Injury showing that an employee has lost three or more work shifts or calendar days from work. *See* § 8–43–101(1), C.R.S. (1992 Cum.Supp.) (employers have an affirmative duty to report *all* injuries

which results in lost time of more than three shifts or calendar days).

However, under § 8–53–102, an employer's knowledge of the employee's injury may not be imputed to the insurance carrier. *State Compensation Insurance Fund v. Wilson,* 736 P.2d 33 (Colo.1987). Nor may the penalty be assessed against an employer for failing promptly to notify its insurer of the work injury. *Campion v. Barta Builders,* 780 P.2d 23 (Colo.App.1989).

Although the claimant was first injured in February 1979, she did not miss more than three calendar days from work until July 1979, when she had surgery. The Employer's First Report of Injury, dated April 21, 1979, prior to the surgery, correctly reported that claimant had not lost any time from work. However, the evidence is sharply conflicting as to whether IBM sent, or Liberty Mutual received, a Supplemental Report of Injury reporting the claimant's subsequent periods of temporary total disability, first in July 1979, and later in 1986 and 1989. Claimant did not file a workers' compensation claim until March 23, 1989, and Liberty Mutual did not file a General Admission of Liability until August 4, 1989.

The ALJ found that Liberty Mutual did not receive notice of claimant's lost time from work until April 2, 1989, when the state division of labor notified it of claimant's claim.

Claimant argues that the evidence entitled her to a presumption that the Supplemental Notice of Injury was duly prepared and mailed by IBM in September 1979 and that it was received by Liberty Mutual. She also argues that it was speculative for the ALJ to find that Liberty Mutual did not receive the 1979 Supplemental Notice of Injury. We find no error.

There is a rebuttable presumption that a letter which was properly addressed, stamped, and mailed was duly delivered to the addressee. *Johnson–Voiland–Archuleta, Inc. v. Roark & Associates,* 43 Colo.App. 370, 608 P.2d 818 (1979). However, when the evidence is conflicting as to whether the letter was mailed initially, the presumption does not arise and the conflict must be resolved by

the trier of fact. *National Motors, Inc. v. Newman,* 29 Colo.App. 380, 484 P.2d 125 (1971); 9 *J. Wigmore Evidence* § 2519 (Chadbourn rev. 1981).

Here, both parties submitted business records setting forth the contents of the IBM and Liberty Mutual files pertaining to the claimant. Although the IBM files showed that its medical department prepared a Supplemental Report of Injury which included the claimant's lost time in September 1979, there was no evidence that the report was actually mailed to Liberty Mutual. Therefore, the presumption of mailing or mail delivery did not arise.

The Supplemental Report was not contained in the Liberty Mutual files; thus, the ALJ could reasonably infer that Liberty Mutual did not receive the report. Although we might have resolved the factual issues differently, there is support in the record for the ALJ's finding, and we are bound by his determination. *Martinez v. Regional Transportation District,* 832 P.2d 1060 (Colo.App. 1992).

We do not address the claimant's hearsay objection because it was not preserved by a timely objection at hearing. *See* CRE 103; *Hancock v. State,* 758 P.2d 1372 (Colo.1988).

### B. Wage Continuation Plan

Claimant argues that the notification duty under § 8–53–102(1) should be modified when the employer has a wage continuation plan under § 8–52–107. Specifically, claimant argues that the term "claim" in § 8–53–102(1) should be construed to include an employer's request for reimbursement from its carrier under § 8–52–107. Under this construction, whenever an employer requested reimbursement from its carrier under § 8–52–107, the carrier would be deemed to have actual or constructive knowledge of a "claim," thereby triggering the carrier's duty under § 8–53–102(1) to admit or deny liability.

Here, however, the record supports the ALJ's finding that Liberty Mutual did not receive a Supplemental Report of Injury from IBM and request for reimbursement of claimant's lost work time until June 1989, at the earliest. By then, the carrier's duty to

admit or deny liability had already been triggered by the claimant's filing of a workers' compensation claim in March 1989.

Moreover, we do not agree that prior requests from IBM for reimbursement of claimant's medical expenses was sufficient to trigger the notification duty under 8–53–102(1). We note that § 8–52–107 does not authorize, or even mention, reimbursement for medical expenses; hence, there is no basis for holding that an employer's request for reimbursement of medical costs is equivalent to actual notification or knowledge of a lost time work injury. Such an interpretation of § 8–53–102(1) would be tantamount to judicial legislation. If the notification provisions under § 8–53–102(1) are inadequate in cases in which the employer has a wage continuation plan, the remedy lies with the General Assembly, not the courts. *See Campion v. Barta Builders, supra.*

### III.

■ Next, we address whether claimant suffered an accidental injury or an occupational disease. At hearing, this issue was considered to be determinative of the claimant's average weekly wage for purposes of computing her temporary disability benefits. Because it was so considered, claimant argues that the ALJ erred in concluding that she sustained an accidental injury. We do not agree that this issue is determinative of the claimant's average weekly wage, but we do agree that the record fails to support the conclusion that claimant's injury was accidental.

■ A claimant's average weekly wage is based upon his or her wages "at the time of injury." Section 8–42–102(2), C.R.S. (1992 Cum.Supp.). However, in cases of occupational disease, the "time of injury" is generally held to be the time of last exposure or onset of disability. *Henderson v. RSI, Inc.,* 824 P.2d 91 (Colo.App.1991).

Here, both the Employer's First Report, prepared by the IBM physician, in April 1979, and the claimant's own claim for compensation, filed in March 1989, identified the claimant's injury as a "repetitive motion" strain and irritation of the ulnar nerve.

Claimant told doctors and subsequently testified that, in February 1979, she felt an electric shock-like pain radiate from her upper right arm into her fingers. Within a month she was experiencing similar pain in her left arm.

Claimant initially was diagnosed with ulnar nerve entrapment in both arms, a condition which her doctors attributed to "heavy and repetitive use of her arms" in her work as a chemical processor. Her medical records between February 1979 and November 1989 are replete with references to "repetitive" motion/strain and to medical restrictions limiting the claimant from performing repetitive arm motions.

In finding that the injury was accidental rather than occupational, the ALJ relied on the fact that the injury could be traced to "a particular place and time." However, the factors of time and place do not adequately differentiate between accidental and occupational injuries.

■ The ALJ omitted a third criterion, namely, the *cause* of injury. The traditional test for distinguishing between accidental and occupational injuries is whether the injury can be traced to a particular time, place, *and cause. See Colorado Fuel & Iron Corp. v. Industrial Commission,* 154 Colo. 240, 392 P.2d 174 (1964); *Martinez v. Industrial Commission,* 40 Colo.App. 485, 580 P.2d 36 (1978).

Here, the evidence was uncontroverted that the *cause* of claimant's injury was heavy and repetitive use of her arms in performing the functions of her job. Because the injury resulted from the conditions of her employment, rather than a specific accident or trauma, the injury is an occupational disease within the meaning of § 8–40–201(14), C.R.S. (1992 Cum.Supp.). *See IML Freight, Inc. v. Industrial Commission,* 676 P.2d 1205 (Colo. App.1983).

The fact that an occupational disease becomes acutely symptomatic does not *ipso facto* transform it from a disease into an accidental injury. *See Masdin v. Gardner–Denver–Cooper Industries, Inc.,* 689 P.2d 714 (Colo.App.1984); *see generally* 1B A. Larson,

*Workmen's Compensation Law* § 41.43 (1993).

Therefore, the Panel erred in affirming the ALJ's conclusion that claimant sustained an accidental injury.

### IV.

There remains, however, the issue of determining the claimant's average weekly wage for purposes of awarding temporary total disability benefits.

The record indicates that claimant suffered three distinct periods of temporary disability. When she initially underwent surgery in July 1979, she was employed as a chemical processor and was earning $309 weekly, plus overtime and benefits. In 1986, when she had a second surgery, she was a computer hardware planner and her earnings had nearly doubled to $605 weekly, plus benefits. Claimant last worked for IBM in November 1989, as an architectural engineer and was paid $785 per week, plus benefits.

The ALJ ruled that compensation for all three periods of disability would be computed based on her 1979 earnings of $309 per week. Claimant contends that the Panel erred in affirming the ALJ's ruling. We agree.

The entire objective of wage calculation is to arrive at a fair approximation of the claimant's wage loss and diminished earning capacity. Although average weekly wage generally is determined from the employee's wage at the time of injury, § 8–42–102(2), C.R.S. (1992 Cum.Supp.), if for any reason this general method will not render a fair computation of wages, the administrative tribunal has long been vested with discretionary authority to use an alternative method in determining a fair wage. Section 8–42–102(3), C.R.S. (1992 Cum.Supp.); *see Williams Brothers, Inc. v. Grimm*, 88 Colo. 416, 297 P. 1003 (1931); *Vigil v. Industrial Claim Appeals Office*, 841 P.2d 335 (Colo. App.1992).

Although the authority under § 8–42–102(3) is discretionary, we believe it would be manifestly unjust to base claimant's disability benefits in 1986 and 1989 on her substantially lower earnings in 1979. Therefore, to compensate fairly for the claimant's actual loss of income, her average weekly wage should be determined based on her earnings at the time of each period of disablement. *See Henderson v. RSI, Inc., supra.*

The August 1990 order concerning the imposition of a penalty against IBM is set aside, and the cause is remanded for further proceedings thereon. That portion of the Panel's order addressing the nature of the claimant's injury and the calculation of her average weekly wage is set aside, and the cause is remanded for further proceedings consistent with this opinion. The remainder of the latter order is affirmed.

JONES and MARQUEZ, JJ., concur.